UNITED STATES, Appellee

v

HOWARD T. ROBERTS, Private First Class,
U. S. Army, Appellant

18 USCMA 42, 39 CMR 42

No. 21,043

December 6, 1968

*Captain Stephen Arinson* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent* and *Captain Anthony F. Cilluffo.*

*Captain Robert M. Steinbach* argued the cause for Appellee, United States. With him on the brief was *Major Edwin P. Wasinger.*

## Opinion of the Court

FERGUSON, Judge:

Before a general court-martial convened at Nha Trang, Vietnam, the accused was charged with, pleaded guilty to, and was found guilty of, one specification of striking a superior officer while in the execution of his office, and one specification of disrespect to an officer, in violation of the Uniform Code of Military Justice, Articles 90 and 89, 10 USC §§ 890 and 889, respectively. He pleaded not guilty to one specification of willful disobedience of a lawful order of his superior officer, also under Article 90, Code, supra, but guilty to the lesser included offense of knowingly failing to obey a lawful order under Article 92. He was found guilty as charged and sentenced to a dishonorable discharge, total forfeitures, confinement at hard labor for six years, and reduction to the grade of E-1. The convening authority reduced the period of confinement at hard labor to five years, but otherwise approved the findings and sentence. With a further reduction in the confinement, the board of review, without comment, affirmed. We granted accused's petition for review on the following issue:

"Whether the errors noted by the Staff Judge Advocate were sufficiently inflammatory as to prejudicially affect the deliberation on sentence."

The Government presented no evidence relative to the specifications to which the accused pleaded guilty, but did call as a witness, on the contested specification, the officer whose order the accused allegedly willfully disobeyed. This officer testified that on the day in question the accused reported to him and requested his pay. At that time, the officer related,

". . . I told him, I'd pay him as soon as he got a hair cut. His hair was extremely long, the side burns were very long, and it did not fit what we considered to be the standard for an airborne soldier. PFC Roberts told me he didn't have any money. I took the money out of my pocket and laid it up on the counter in front of my desk, and said 'There's the money, I'll have the guard take you over and have your hair cut.' He said, 'I'm not getting my hair cut' and he walked out of the orderly room. At this time, I called him back in and I said, 'Do you understand the order I gave you—I want you to get your haircut this afternoon, do you understand it?' 'Yes, sir.' And he left the orderly room at that time.

"Q: What happened next?

"A: About two minutes later, the guard came back in and said Roberts was getting his air mattress and said he was going to the beach, which would have been breaking restriction. He was restricted to the company area, at this time. I went outside and stopped Roberts, and told him to put his air mattress back up, and get a hair cut, he was not going to the beach. He went back in the tent and left his air mattress and came back out. He and the guard, the last time I saw them were walking toward the Airborne Battalion Barber Shop.

"Q: When was the next time you saw him?

"A: It was approximately 2200 hours, that night.

"Q: Had he gotten his hair cut at that time?

"A: No, sir.

"Q: Had you set a specific time by which he had to have that hair cut?

"A: Yes, sir. I told him in the orderly room, that I wanted his hair

**43**

cut by 1500 hours, and report back to me, and I would give him his pay—his money at that time.

"Q: Did the accused know who you were or your official position?

"A: Yes, sir.

"Q: What was his attitude toward you, when you gave him the order?

"A: He took it, I think in a joking sense. He wasn't serious about it. He gave me the impression at that time that he wasn't going to obey the order at that time, and I wasn't surprised that he didn't.

"Q: To the best of your knowledge, was there anything which prevented him from getting a hair cut?

"A: No, sir.

"TC: No further questions."

By way of cross-examination defense counsel unsuccessfully attempted to elicit from the witness testimony which would sustain the defense position that the failure to obey the order was not willful. The accused did not testify and no defense evidence was proffered on the merits.

Thereafter, both sides rested and after arguments by counsel and instructions by the law officer the court returned its verdict of guilty, as charged.

Subsequent to informing the court of the relevant personal data concerning the accused, trial counsel recalled, as a witness, the aforementioned officer-witness who testified to the events surrounding the two offenses to which the accused pleaded guilty. He himself was the officer struck by the accused and he was present when Roberts uttered the charged disrespectful language to another officer. It is with regard to this latter testimony that the granted issue is concerned.

In addition to relating that he overheard the accused tell the company commander, ". . . the policy" (the charged language), the witness also testified that the accused, in reply to questions of the commander,

said ". . . no"; ". . . the Army and the Vietnam cause." He believed the accused to be intoxicated at the time, since he admitted he'd been drinking contrary to orders and was weaving, although only moderately. The witness was then asked by trial counsel:

"Q [Trial Counsel]: Do you know of any reason why Captain Mavroudis cannot be here today and testify as to the offense?

"A: Yes, sir; he was killed in action on 27 October."

The Staff Judge Advocate noted these matters in his post-trial review. As he informed the convening authority, the prosecution may, following a plea of guilty, enter into evidence matters in aggravation of the charged offenses. Paragraphs 70 and 75b(3), Manual for Courts-Martial, United States, 1951. The purpose of such evidence is to enlighten the court as to the facts of the case more fully than the sketchy recitation of the offense as set forth in the specifications. Since the accused has already acknowledged his guilt at this point, only facts pertaining to the offense charged should generally be admissible. Included with the scope of such facts would be those explaining the circumstances leading up to the offense charged so as not to make it appear that the incidents alleged occurred in a vacuum. However, facts happening after the offense has occurred, which do not tend to explain it, would be irrelevant. Thus, he opined, the derogatory and inflammatory words uttered by the accused after he spoke the alleged words of disrespect are extraneous and the revelation of them to the court was, in his view, calculated to inflame the court against the accused.

In the same view, the Staff Judge Advocate reported, the fact that Captain Mavroudis was not present in the courtroom was not relevant since the witness-officer's testimony as to the circumstances surrounding the offense was completely adequate. He believed that the only purpose served by revealing to the court the fact of

44

the Captain's subsequent death in combat again could only have been to inflame the court.

Although he believed that the introduction of this testimony probably did not prejudice the substantial rights of the accused, to allay any doubts he recommended a reduction in the confinement portion of the sentence from six to five years.

Before us, the defense urges that receipt of the utterances of uncharged statements, and especially the evidence of Captain Mavroudis' death in combat, was so inflammatory as to materially prejudice the court in its deliberation on sentence.

It is axiomatic that the prosecution should not attempt to excite the passions of the fact finders by evidence which, even if otherwise admissible, is unduly inflammatory. We so stated in United States v Thomas, 6 USCMA 92, 97, 19 CMR 218; citing People v Burns, 109 Cal App 2d 524, 241 P 2d 308 (1952); Avirett v State, 128 Tex Crim App 647, 84 SW2d 482 (1935). Indeed, where it is irrelevant, its admission is prejudicial. See 1 Wharton, Criminal Evidence, 12th ed, § 160, page 311 (citation at footnotes 7 and 8 omitted). As stated in Underhill, A Treatise on the Law of Criminal Evidence, 5th ed, § 11, page 14: "Evidence which has no tendency to prove or disprove any issue involved in the case should be excluded as a matter of course. This is particularly true of matters foreign to the controversy which excite the jury's prejudice or passion, but evidence which bears on the issues may be received even though it excites prejudice or passion." Cf. United States v Bennett, 7 USCMA 97, 21 CMR 223, and cases cited therein at page 102.

What then of the evidence, in the case at bar, which the Staff Judge Advocate found irrelevant and inflammatory? Was he correct in his determination or were these matters proper evidence in aggravation of the offense charged? (Paragraphs 70 and 75b(3), Manual, supra.)

With reference to the additional statements of disrespect, allegedly uttered by the accused in front of the company commander, a case might be made that they were part and parcel of the entire offense charged; that is, that they reflected accused's attitude as one of defiance toward his commander and the military authority which he represented. That these, too, could have been set forth in the specification (no greater punishment would have been incurred thereby) is without question, but the fact of the matter is that they were not. The charged statement reflected a distasteful attitude toward a company policy that there be no drinking while the platoon was preparing for an assault to take place the next day. The additional statements, however, included not only the totality of the Army but its mission in Vietnam as well. This, in our view, goes far beyond the meaning of the words set forth in the specification.

The devastating effect of this testimony is especially apparent when considered in conjunction with the evidence that the company commander was not present to testify because he was killed in combat. This latter evidence is patently irrelevant inasmuch as it was a collateral fact, incapable of affording any reasonable presumption or inference as to the principal matter in dispute. 22A CJS, Criminal Law § 602. The accused had pleaded guilty and thereby admitted the offense. The witness-officer was a proper person to present to the court-martial testimony surrounding the *circumstances* of the offense. As such, he obviated the need for the commander, to whom the disrespectful language was directed, to be present. His absence was not questioned by the defense. Even the witness did not offer an explanation until expressly requested to do so by trial counsel. This was error. See United States v Johnson, 3 USCMA 447, 13 CMR 3. When considered with the fact that this case was being tried in a combat area before officers of the I Field Force, Vietnam, the

45

conclusion that this evidence was highly inflammatory is unassailable. When coupled with the accused's derogation of the United States Army and the cause for which these officers were risking their lives and for which the commander died, the effect is as noted above.

We are not unaware of the fact that the Staff Judge Advocate believed the evidence to be inad-missible and inflammatory and, out of an abundance of caution, recommended a reduction in the confinement from six to five years. However, we note, he also advised the convening authority, himself a combat veteran, that the error probably "did not prejudice the substantial rights of the accused." In this we believe he was wrong.

Some trial errors affecting the sentence may be purged by reassessment of the sentence on review. Article 67(f), Code, supra; United States v Brady, 17 USCMA 614, 38 CMR 412. Other errors require a rehearing before a court-martial, notwithstanding the fact that the error was noted below. United States v Beach, 15 USCMA 119, 35 CMR 91. We believe this to be such a case.

Accordingly, the decision of the board of review is reversed. The record of trial is returned to the Judge Advocate General of the Army. A rehearing on the sentence may be ordered.

Chief Judge QUINN concurs.